IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Angel Perez, Jr., | ) | |
| | ) | No. 1:18-cv-180 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Hon. Richard A. Lanzillo |
| | ) | United States Magistrate Judge |
| The Borough of Johnsonburg, | ) | |
| David Cuneo, | ) | Memorandum Opinion on Defendants' |
| | ) | Motion for Summary Judgment |
| Defendants | ) | |
| | ) | ECF No. 45 |

Defendants' motion for summary judgment (ECF No. 45) is pending before

the Court.  For the reasons discussed below, the motion will be granted in part and

denied in part.

I.    Introduction

The Fourth Amendment plays a major role in regulating how police officers

interact with members of the public.  It limits their authority to arrest individuals and

evinces a general preference that such deprivations of liberty occur only upon the

issuance of a warrant by an independent judicial official.  The Fourth Amendment

also limits the force officers may use in effectuating an arrest or other detention.

While the law gives "a certain deference to police officers who employ reasonable

means to effect the arrest of dangerous or resisting subjects," that deference does not

extend to uses of force that are excessive or improperly motivated.  *Kircher v. Pennsylvania*

1

*State Police Department*, 2016 WL 4379143, at *1 (M.D. Pa. Aug. 8, 2016). In determining whether an officer's use of force was reasonable, "the after acquired benefits of hindsight must yield to an objective sense of reasonableness," the boundaries of which are set by "the officer's observations in that particular moment." *Id.* The facts of this case implicate these principles and competing considerations.

II.   Material Facts

This action arises out of a November 21, 2017 encounter between Plaintiff Angel Perez (Perez) and Defendant David Cuneo (Cuneo), a police officer employed by Defendant Borough of Johnsonburg, Pennsylvania. That encounter involved Cuneo's initial seizure of Perez, followed by his escalating use of force, which ultimately culminated in Cuneo's use of his service weapon to shoot Perez. The following facts are taken from the Defendants' Concise Statement of Material Facts (ECF No. 47), Perez' Responsive Concise Statement (ECF No. 57), and the exhibits thereto. Citations to record are omitted except where the Court refers to specific deposition testimony. Material disputes of fact are noted.

Perez was known to local law enforcement authorities, including Cuneo, prior to November 21, 2017. Cuneo had known Perez since joining the Johnsonburg Borough Police Department in 2007. Perez had a history of illegal drug use and previously had been charged with various criminal offenses, including burglary and theft; he had served time in state and local prisons.

In November 2017, the St. Marys, Pennsylvania, Police Department was investigating a burglary that occurred within its jurisdiction. On November 5, 2017, Sergeant Pistner of the St. Marys P.D. called Cuneo and told him that Perez was a suspect in the investigation of that burglary and that the St. Marys P.D. would be seeking a search warrant to obtain a DNA sample from Perez. Cuneo received a call from another St. Marys police officer the following week regarding his department's attempts to obtain a search warrant for Perez' DNA. The St. Marys P.D. ultimately secured the DNA search warrant at 12:50 p.m. on November 20, 2017. ECF No. 53-4. Although Cuneo had never been presented with a warrant for Cuneo's arrest, and no one had told Cuneo that the St. Marys Police had procured such a warrant, Cuneo erroneously assumed that both a warrant to arrest Perez and a search warrant for his DNA were outstanding. ECF No. 47-2 (Cuneo Deposition), p. 18 ("Well, I thought there was two warrants…That there was a body warrant for the burglary and they wanted his DNA and had a search warrant for that."). At least as of November 20, 2017 through the date of his deposition, Cuneo did not distinguish between the two types of warrants as far as how he dealt with individuals such as Perez. *See id.*, p. 20. And, as of the date of his encounter with Perez, Cuneo also did not know that the search warrant that the St. Marys P.D. actually obtained for Perez'

3

DNA expressly limited its execution to between the hours of 6:00 a.m. and 10::00 p.m.[1]

On November 20, 2017, Cuneo started his shift at 11:00 pm and was scheduled to conclude his shift at 7:00 a.m.  He was the only officer on duty that night.  Cuneo testified that, upon his arrival at the police department, he reviewed the daily log entries from the preceding shift and noted that the St. Marys Police Department was "looking for Perez" pursuant to "a search warrant for his DNA."  The log included no reference to an arrest warrant but, as noted, Cuneo nevertheless assumed that the St. Marys P.D. had also secured a warrant for Perez' arrest.  Based upon this erroneous assumption and his ignorance of the time limitation upon which officers were authorized to execute the DNA search warrant, Cuneo intended to arrest Perez if, and whenever, he encountered him.  *Id.*

Shortly after Cuneo began his shift, he parked his police vehicle near a local convenience store.  Just after midnight, Cuneo observed Perez walking down the street.  Cuneo drove from the convenience store past Perez.  As Perez approached, Cuneo exited his vehicle and stated he needed to talk to him.  Perez recognized Cuneo, responding "what's up Cuneo?".  Cuneo then told Perez that the St. Marys P.D. had a warrant for his arrest, and a warrant to collect a DNA sample, and that he would be taking him to the St. Marys P.D. pursuant to those warrants.  Perez declined

---

[1] Pennsylvania Rule of Criminal Procedure 203 requires that search warrants conducted at night be authorized only after a finding of "reasonable cause."  Pa. R. Crim. P. Rule 203 (E).  No such authorization was obtained regarding the search warrant for Perez' DNA.

to go with Cuneo, stated that he was going home, and began to run or jog away. Cuneo pursued Perez and discharged his taser weapon, the leads or conducting prongs of which struck Perez in the back of the head. Cuneo contends that prior to deploying his taser, he warned Perez that "you better stop or I'm going to tase you." Perez asserts that Cuneo provided no warning before firing his taser. The parties do agree, however, that the shock of the taser caused Perez to fall to the ground and that as Perez fell his face struck a large rock. The impact of his fall broke Perez' nose. Cuneo approached Perez and instructed him to "stay down." At this point in the encounter, Perez was lying face-down on the ground. Cuneo testified that Perez repeatedly attempted to stand up and that each time Perez did so, he engaged his taser to shock him. Cuneo's taser was equipped with a camera that began recording when Cuneo first activated the weapon. *See* ECF No. 49.

The camera recorded that Cuneo discharged his taser on Perez five times during the encounter. The first discharge lasted approximately 5 seconds; the second, approximately 14 seconds, the third, approximately 40 seconds, the fourth, approximately 20 seconds, and the fifth, approximately 20 seconds. The video also shows Perez lying face-down on the ground with his hands initially beneath his chest, and Cuneo is heard repeatedly instructing Perez to place his hands behind his back. Between the second and third tasing, Cuneo is recorded threatening Perez, "I will light the fuck up" if Perez does not comply. Perez is recorded repeatedly telling Cuneo he is unable to comply because he is injured. It is clear from the video that

Perez' hands were no longer concealed beneath his chest after the third tasing. Cuneo is also recorded advising Perez that he needed medical assistance.

After the last discharge of Cuneo's taser, Perez attempted to stand up, which prompted Cuneo to attempt to discharge his taser again. This time, however, the taser did not administer a shock to Perez. Apparently, Cuneo's prior uses of the taser had exhausted its charge. Cuneo and Perez disagree as to what happened next, and because Cuneo's taser had fallen or been dropped to the ground, it no longer recorded video of the interaction between the two.[2] Perez asserts that he did not aggress towards Cuneo but instead attempted to get off the ground and flee as Cuneo repeatedly struck him with his retractable police baton. In contrast, Cuneo maintains that Perez stood up, lunged at him, and punched him in the face. Cuneo claims that he and Perez traded blows for "over eight minutes" during which time he sustained more than 20 punches from Perez to his head. ECF No. 53-2, p. 111. As the fight went on, Cuneo says he fell to his knees and Perez continued to hit him. *Id.*, p. 128. Perez denies lunging at Cuneo but admits to "rolling around on the ground" during the struggle. At some point during this struggle, a witness, Thomas Costanzo, arrived on the scene.

Costanzo told Perez to "just get on the ground" and to listen to Cuneo. At one point, Costanzo attempted to grab Perez' arm or coat to assist Cuneo, but he

---

[2] However, the taser continued to record audio.

withdrew when he noticed significant amounts of blood on Perez, apparently from the injuries he had sustained during the encounter. Desiring to avoid possible contamination from Cuneo's blood, Costanzo returned to his car but remained in the area for the rest of the encounter. Cuneo asserts that Perez continued to strike him with his fists and wrestle with him while Perez contends that he was merely trying to escape Cuneo's blows. Both apparently agree that Cuneo struck Perez several times in the head with his collapsible baton in an effort to subdue him. Perez contends that he attempted to run away from Cuneo to escape his blows when Cuneo drew his firearm and shot him in the back. Perez asserts that he was approximately 12-20 feet away when Cuneo shot him. Costanzo, who remained at the scene, estimated that Perez was approximately 10-to-15 feet away when Cuneo shot him.

Cuneo's version of events leading to his shooting Perez differs materially from Perez' recounting. He testified that he told Perez, "Angel, if you hit me one more time, I'm going to shoot you." Cuneo asserts that Perez continued to attack him and, fearing he might lose consciousness or Perez might acquire his gun, he drew and discharged his weapon. Cuneo theorizes that his bullet struck Perez in the back because Perez must have been twisting or turning when he fired his weapon. Perez fell to the ground, landing in a face down position with both hands pinned underneath his body. Cuneo held Perez on the ground for approximately twenty to thirty seconds until police officers from neighboring jurisdictions arrived on scene.

The responding officers then proceeded to handcuff Perez and check his person for weapons. Perez was unarmed but he was found to be in possession of hypodermic needles and drug paraphernalia. Once Perez had been secured, an ambulance was dispatched to the scene of the arrest. Responding paramedics found an "oddly shaped" bullet hole in Perez' back. Perez was transported to a nearby hospital. During the ride to the hospital, Perez told an accompanying police officer that he had been using methamphetamines "all day." Laboratory analysis later confirmed Perez' statement.

III.   Procedural History

Perez initiated this lawsuit by filing a Complaint on June 18, 2018. ECF No. 1. He named the Borough of Johnsonburg and Officer Cuneo as defendants. Perez amended his Complaint on August 27, 2018 (ECF No. 9) and the Defendants answered on September 18, 2018 (ECF No. 11). All parties have consented to the jurisdiction of a United States Magistrate Judge. *See* ECF Nos. 8, 10, 14.

Following discovery, the Defendants filed the instant motion, a brief in support of the motion, and a Concise Statement of Material Facts. *See* ECF Nos. 45-47. Thereafter, Perez filed a brief in opposition to the Defendants' motion, and a responsive Concise Statement of Material Facts. ECF No. 53. The Defendants have filed a Reply Brief (ECF No. 55). The matter is now ripe for disposition.

IV.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  Instead, once the movant satisfies its burden of identifying evidence that

demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

To state a claim for relief under § 1983, "a plaintiff must demonstrate the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." Accordingly, to evaluate Perez' claims in the context of a motion for summary judgment, the Court must determine whether there are disputed issues of material fact that, if found for Perez, would show he was deprived of a constitutional right. *Cost v. Borough Of Dickson City, et al.*, 2021 WL 2255505, at *4 (3d Cir. June 3, 2021) (quoting *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted).

V.     Discussion and Analysis

   A.     Clarification of the Fourth Amendment Claim

   Before proceeding, the Court must clarify the nature of Perez' claim.  Perez'

Amended Complaint (ECF No. 9) includes three counts: a Fourteenth Amendment

due process/bodily integrity claim (Count I), a Fourteenth Amendment due

process/state created danger claim (Count II), and a Fourth Amendment excessive

force claim (Count III).  Count I also includes a claim that "Defendant Cuneo's

actions and inactions, as described [earlier in the Amended Complaint], constitute

violations of Plaintiff's rights under the Fourteenth Amendment to the United States

Constitution[, including]...*the right to be free from unreasonable searches and seizures.*"  ECF

No. 9, ¶ 32 (emphasis supplied).  Earlier in his pleading, Perez refers specifically to

Cuneo's attempt to arrest him without an arrest warrant.  *Id.*, ¶ 15.  Accordingly, the

Court interprets the Amended Complaint to include a claim challenging the

constitutionality of Cuneo's initial stop and arrest of Perez.  Defendants also

understood the Amended Complaint to raise this claim as the very first argument

asserted in their brief in support of their motion for summary judgment is a

full-throated defense of the legality of Cuneo's stop of Perez.  ECF No. 46, pp. 5-9.

The parties also conducted significant discovery regarding this claim.

   The Fourth Amendment right to be free from unreasonable search and seizure

is applicable to the states through the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S.

643 (1961).  Similarly, the warrant requirements of the Fourth Amendment have also

been incorporated against the states through the Fourteenth Amendment. *See Aguilar v. Texas*, 378 U.S. 108 (1964); *Ker v. California*, 374 U.S. 23 (1963).  However, Perez' attempt to raise substantive due process and "state created danger" claims under the Fourteenth Amendment is untenable.  As the Supreme Court has explained, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth … Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.17 (1997); *see also Tingey v. Gardner*, 827 Fed. Appx. 195 (3d Cir. 2020) (quoting *Lanier*).  Under the more-specific provision rule, Perez' claims in Counts I and II of the Amended Complaint relating to Cuneo's alleged unlawful stop and arrest and use of excessive force must be analyzed under the Fourth Amendment, the constitutional provision specifically addressing the rights Perez seeks to vindicate.  This rule precludes Perez from recasting these claims as substantive due process or "state created danger" claims under the Fourteenth Amendment. *See Tingey*, 827 Fed. Appx. at 198 (holding that a substantive due process claim crashes into the more-specific-provision rule); *Salyer v. Hollidaysburg Area Sch. Dist.*, 2016 WL 5376218, at *5 (W.D. Pa. Sept. 26, 2016) (citing *Wheeler v. City of Philadelphia*, 367 F. Supp. 2d 737, 747 (E.D. Pa. 2005) ("pure" Fourth Amendment claims cannot also be brought under the Fourteenth Amendment using the state-created danger doctrine)).

B.     Cuneo Is Not Entitled to Summary Judgment on Perez' Unlawful
       Seizure Claim.

    1.   Defendants' Argument that Cuneo's Detention of Perez was a "*Terry
        Stop*" is Contrary to the Record.

"[T]he 'seizure' of a 'person' …can take the form of 'physical force' or a 'show

of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*,

592 U. S. __,141 S. Ct. 989, 995 (2021) (internal punctuation omitted) (quoting *Terry v.

Ohio*, 392 U. S. 1, 19, n. 16 (1968)). Whether Cuneo's seizure of Perez occurred when

he deployed his taser to stop Perez from leaving or when Perez submitted after being

shot in the back, there is no question that Cuneo seized Perez within the meaning of

the Fourth Amendment. *See Brendlin v. California*, 551 U.S. 249, 250 (2007) (holding

that "[a] seizure occurs when a reasonable person (1) would not feel 'free to leave' or

(2) would not feel 'free to decline the officers' requests or otherwise terminate the

encounter'"); *Alvin v. Calabrese*, 455 Fed. Appx. 171, 175 (3d Cir. 2011) (when a

person's "liberty is restrained by an officer's 'show of authority,' a seizure does not

occur unless the person yields to that show of authority." (citing *California v. Hodari D.*,

499 U.S. 621, 626 (1991)).

Defendants argue that Cuneo's encounter with Perez started as a simple

"investigatory stop" pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). The record,

including Cuneo's own deposition testimony, belies this characterization. Cuneo

testified that when he encountered Perez on November 20, 2017, he believed that

both a search warrant and an arrest warrant, which he describes as a "body warrant,"

had been issued for Perez.  ECF No. 47-2, p. 18 ("Well, I thought there was two

warrants…That there was a body warrant for the burglary and they wanted his DNA

and had a search warrant for that.").  In Cuneo's mind, the distinction between the

two types of warrants made no difference in how he approached and dealt with

subjects such as Perez.  Cuneo testified:

> Q.    Does the difference in the type of warrant change
>       your approach to how you approach an individual in
>       attempting to either arrest them under a body
>       warrant or get an item from them under a search
>       warrant?
>
> A.    No.
>
> Q.    Your approach is the same?
>
> A.    Yes.
>
> Q.    What---what is your approach?
>
> A.    I would look for them, see them, tell them they have
>       a warrant, place them under arrest for the warrant,
>       and then whatever the instructions would be from
>       that.

*Id.*, p. 20.

This was precisely the approach Cuneo intended to take, and ultimately did

take, when he encountered Perez on November 20, 2017.  Cuneo testified

unambiguously that if he encountered Perez, he intended to place him under arrest:

> Q.    So if it was *only a search warrant like for DNA, would you*
>       *place that person under arrest* before you would attempt
>       to collect DNA?
>
> A.    It would still be a warrant, *yes.*

Q.     Okay.  Tell me what---you, if everything had gone
       smoothly with Angel Perez, what would the
       procedure have been as far as executing the search
       warrant for his DNA?

                              ***

A.     If it would have went smoothly, I would have met
       him.  As I said, I have nothing in this.  *I'd take him
       into custody, put him into cuffs under the warrant.  He'd be
       under arrest.*  I would then notify the department that
       wanted him and we would do a transfer halfway.

Q.     So even if it was just a search warrant for his DNA,
       *you would actually place him under arrest?*

A.     *Yes.*  It's still a warrant.

*Id.* (emphasis supplied).

Cuneo's intentions and actions on November 20, 2017 were wholly

inconsistent with a "*Terry* stop"—i.e., "a 'brief, investigatory stop when the officer has

a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v.*

*Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (*quoting Illinois v. Wardlow*, 528 U.S. 119, 123

(2000)).  *See also United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a

reasonable suspicion, grounded in specific and articulable facts, that a person they

encounter was involved in or is wanted in connection with a completed felony, then a

*Terry* stop may be made to investigate that suspicion.")).  Cuneo was not involved in

the St. Marys Police Department's investigation of the burglary that occurred within

its jurisdiction.  He independently observed no conduct or circumstances to support a

15

reasonable suspicion that Perez was engaged in criminal activity when he encountered him. While Defendants' principal brief devotes significant attention to Perez' history of drug use, criminal record, and prior incarceration, these facts alone did not support a *Terry* stop, and certainly not an arrest. Defendants do not argue, and the record does not support, that Cuneo observed any conduct or circumstances on November 17, 2017 that created a reasonable suspicion that Perez was engaged in criminal activity. More importantly, Cuneo unambiguously testified that he formed the intent to arrest Perez on sight *before* he encountered him. The fact that drug paraphernalia was discovered on Perez' person *after* the stop and that he later admitted to drug use in no way justifies the initial stop because Cuneo knew none of this information when he initiated his arrest of Perez.

Thus, Cuneo based his decision to take Perez into custody on none of the factors recognized in *Terry* and its progeny. Instead, Cuneo's intent was clear—he was going to place Perez under arrest pursuant to the warrant. Cuneo's intent to place Perez under arrest and transport him to St. Marys Police Department personnel is fundamentally inconsistent with a *Terry* stop. In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the

least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. "The brief investigative stop allowed under *Terry*, is just that; a brief stop to allow police to investigate. *The initial stop does not justify an arrest,* prolonged detention, or a stop that lasts any longer than is reasonably necessary to investigate." *United States v. Bey*, 911 F.3d 139, 146-47 (3d Cir. 2018) (emphasis supplied).

Because the record supports a finding that Cuneo arrested Perez on November 20, 2017—and was not conducting a brief investigatory *"Terry* stop"— Defendants' motion next requires that the Court determine whether the record establishes the legality of that arrest as a matter of law.

> 2. Cuneo's Arrest of Perez was Beyond the Authority Granted by the DNA Warrant and, Therefore, a Violation of the Fourth Amendment.

The warrant obtained by the St. Marys Police Department authorized the collection of DNA samples from Perez. The application of a cheek swab to "obtain DNA samples is a search" subject to the Fourth Amendment's prohibition against "unreasonable searches and seizures." *Maryland v. King*, 569 U.S. 435, 446, 133 S. Ct. 1958, 1968–69, 186 L. Ed. 2d 1 (2013). Indeed, "[v]irtually any 'intrusion into the human body…will work an invasion of 'cherished personal security' that is subject to constitutional scrutiny." *Id.* (internal citation and quotation omitted) (*citing Cupp v.*

*Murphy*, 412 U.S. 291, 295, 93 S. Ct. 2000, 36 L.Ed.2d 900 (1973) (quoting Terry v.

Ohio, 392 U.S. 1, 24–25, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)).

Here, Perez does not argue that the police lacked probable cause to obtain the

search warrant for his DNA.  Rather, he challenges the legality of the timing of

Cuneo's attempted execution of the warrant.  The warrant expressly limited the

authority of officers to execute the warrant to between the hours of 6:00 a.m. and

10:00 p.m.  Pennsylvania law, much like the Federal Rules of Criminal Procedure,

draws a distinction between arrest/bench warrants and search warrants.  Pennsylvania

Rule of Criminal Procedure 150 governs the issuance and execution of bench

warrants and does not place any limitation on the time when officers can take a

suspect into custody.  Pennsylvania Rule of Criminal Procedure 515 similarly governs

the issuance and execution of arrest warrants, and like Rule 150, does not prohibit the

execution of a warrant at night.  In fact, Pennsylvania Rule of Criminal Procedure 431

institutes specific procedures for bench and arrest warrants served outside of the

hours of 6:00 a.m. and 10:00 p.m.  *See* Pa. R. Crim. P. 431(A)(1) and (2). In contrast,

Pennsylvania Rule of Criminal Procedure 203 requires that search warrants conducted

at night be authorized only after a finding of "reasonable cause."  Pa. R. Crim. P. Rule

203

Defendants acknowledge that no arrest warrant was outstanding for Perez

when Cuneo arrested him on November 20, 2017.  They also do not argue that the St.

Marys police made the "reasonable cause" showing necessary to authorize execution of the search warrant at night.  Indeed, it is undisputed that the warrant to collect Perez' DNA expressly restricted the hours of its execution to between 6:00 a.m. and 10:00 p.m. and that Cuneo's arrest of Perez occurred well-outside of this authorized timeframe.

Absent ambiguity in the warrant, "the issue whether the search was in fact authorized by the warrant is determinable by a reading of the warrant's simple and unambiguous language." *U. S. ex rel. Boyance v. Myers*, 398 F.2d 896, 898 (3d Cir. 1968).  This includes language restricting when a warrant may be served.  *Id.* at 898-99 ("To find that a warrant which is explicitly limited to daytime searches legalizes search at any hour of the day or night would be to disregard the magistrate's actual determination and thus to nullify the requirement of a prior impartial determination that a particular search will be reasonable.").  "'When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman, or Government enforcement agent.'" *Id.* at 899. (quoting *Johnson v. United States*, 333 U.S. 10, 14 1948)).  Thus, at the time Cuneo encountered Perez, the DNA search warrant's simple and unambiguous terms provided Cuneo with no authority to arrest Perez or to otherwise take him into custody for delivery to the St. Marys P.D.

    3.  The Record Belies that Cuneo had a Reasonable Belief that He Was
         Authorized to Arrest Perez on the DNA Warrant.

Prior to November 20, 2017, Cuneo learned that the St. Marys police would be

obtaining "a search warrant in order to obtain a sample of DNA from Perez" in

connection with their investigation of a burglary.  ECF No. 47 (Defendants' Concise

Statement of Material Facts), ¶ 21.  Although Cuneo admits that he was never told

that an arrest warrant had been issued for Perez, he assumed that an arrest warrant for

Perez was outstanding on November 20, 2017.  ECF 47-2, p. 19.  The existing record

includes nothing to support that Cuneo ever attempted to verify his erroneous

assumption or that he requested a copy of the warrant, or even asked about its nature,

contents, or limitations.  In addition, given his years of experience as a law

enforcement officer, he should have known that Pennsylvania law did not permit the

execution of a search warrant at night unless specifically authorized following a

showing of "reasonable cause."  Thus, the record does not support a finding as a

matter of law that Cuneo had a reasonable (albeit mistaken) belief that a warrant

authorizing the arrest of Perez was outstanding.  Indeed, the illegality of the execution

of a search warrant outside of its specified limitations had been clearly established for

decades before Cuneo's encounter with Perez.  *See Sgro v. United States*, 287 U.S. 206,

212 (1932) (holding that a warrant is "dead," and a search undertaken pursuant to that

warrant invalid, after the expiration date on the warrant); *Johnson v. United States*, 333

U.S. at 14 (holding that the parameters of a search are "to be decided by a judicial

officer, not by a policeman, or Government enforcement agent"). In 1968, the Court of Appeals for the Third Circuit specifically applied this rule to a search warrant executed outside of its specified time limitations. *See U. S. ex rel. Boyance v. Myers, supra.*

### C. Perez' Excessive Force Claim

1. The Illegality of Cuneo's Arrest Does Not Bear on Perez' Separate and Independent Excessive Force Claim.

Perez' illegal stop/arrest claim and his excessive force claim are distinct claims under the Fourth Amendment. *See, e.g., Klein v. Madison*, 374 F. Supp. 3d 389 (E.D. Pa. Apr. 10, 2019) (noting separate claims under the Fourth Amendment for a warrantless search and the use of excessive force); *Waugh v. Dow*, 2014 WL 2807574 *3 (W.D. Okl. June 20, 2014) (granting summary judgment on Fourth Amendment warrantless arrest claim but denying summary judgment on Fourth Amendment excessive force claim). *Bello v. Lebanon City Police Dep't*, 2013 WL 53981, at *7 (M.D. Pa. Jan. 3, 2013) (recognizing separate claims under the Fourth Amendment where the fact of a warrantless arrest was offered "in support of" plaintiff's excessive force claim) (emphasis in original). Indeed, the Court of Appeals for the Third Circuit has cautioned against conflating the two claims. In *Snell v. City of York, Pa.*, for example, the plaintiff argued that the force applied during arrest was unreasonable (*i.e.*, excessive) because his initial arrest was illegal. 564 F.3d 659, 672 (3d Cir. 2009). The Court of Appeals rejected this argument and held that a plaintiff's illegal arrest does

not turn his arrest into an excessive force case. *Id.* If that were so, "every unlawful arrest claim would bring with it a tagalong excessive force claim. That is not the law." *Daniels v. City of Philadelphia,* 2017 WL 25382, at *4 (E.D. Pa. Jan. 3, 2017) (citing *Snell,* 564 F.3d at 672) ("We have rejected similar efforts to bootstrap excessive force claims and probable cause challenges.") (citations omitted). *See also Bodine v. Warwick,* 72 F.3d 393, 400 & n.10 (3d Cir. 1993) (rejecting conflation of claims for false arrest and excessive force, noting that "merely because a person has been falsely arrested does not mean that excessive force has been used"); *Brackbill v. Ruff,* 2018 WL 2322014, *5 (M.D. Pa. May 22, 2018). As the Court of Appeals for the Seventh Circuit noted, "the doctrine of Fourth Amendment reasonableness has distinct, component parts. A seizure without probable cause is conceptually different from a seizure that employs excessive force; both are unreasonable but for different reasons." *Carlson v. Bukovic,* 621 F.3d 610, 622 n. 19 (7th Cir. 2010).

Thus, Cuneo's arrest of Perez on an inactive search warrant does not mean that the force Cuneo used to effectuate the arrest was excessive. *See Boardman v. City of Philadelphia,* 661 Fed. Appx. 183, 190 (3d Cir. 2016) (citing *Romero v. Story,* 672 F.3d 880, 890 (10th Cir. 2012) ("[i]f the district court concludes that the arrest was unlawful, the court may not automatically find any force used in effecting the unlawful arrest to be excessive.") "Instead, the district court must analyze the excessive force [claim] under the assumption that arrest was lawful." *Id. See also Idris v. Conway,* 2014

WL 4244222, *7 (N.D. Ill. Aug. 27, 2014) (holding that an unlawful arrest has no

bearing on an excessive force claim).

2. Disputed Issues of Material Fact Remain for Trial Regarding the
   Reasonableness of Cuneo's Escalating Use of Force.

Even if Cuneo's arrest of Perez was unconstitutional or otherwise illegal, Perez

had no right to resist that arrest. *United States v. Ferrone*, 438 F.2d 381, 389-90 (3d Cir.),

cert. denied, 402 U.S. 1008 (1971) (no right to resist search pursuant to invalid search

warrant). A civil rights action or other appropriate court action—not self-help

resistance—was Perez' permissible means to address and remedy this deprivation.

Perez' refusal to comply with Cuneo's directions triggered Cuneo's authority to use

reasonable force to effectuate the arrest. At the same time, the Fourth Amendment

protects a citizen against an unreasonable use of force in connection with an arrest,

investigatory stop, or other seizure. *Graham v. Connor*, 490 U.S. 386 (1989). The

analysis used to review excessive force claims is well known; its touchstone is

reasonableness. *Id.*, at 397. *See also Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Santini v.

Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) ("In an excessive force case, we determine

whether a constitutional violation has occurred using the Fourth Amendment's

objective reasonableness test."); *Harrison-El v. Gaffney*, 2021 WL 1721593 (E.D. Pa.

Apr. 30, 2021).

The "reasonableness" of particular uses of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Id.* Further, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Whether the use of force was reasonable is normally a question for the jury. *Rivas*, 365 F.3d at 198.

Cuneo and Perez agree that during their initial interaction, Cuneo informed Perez that he was arresting him pursuant to the DNA search warrant. When Perez attempted to leave the scene, Cuneo deployed his taser to stop him. While Cuneo and Perez' versions of the subsequent events differ materially, they agree that Cuneo's further use of force included his repeated engagement of his taser to shock Perez, his striking of Perez with his retractable baton, and ultimately the use of his gun to shoot Perez. As to each use of force, "the Court asks whether the officer's conduct was 'objectively reasonable' in light of the totality of the facts and circumstances." *Lynn v. Schertzberg*, 169 Fed. Appx. 666, 669 (3d Cir. 2006) (citing *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004). Factors that the court should consider include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers and others, (3) whether the action takes place in context of effecting an arrest and suspect is actively resisting arrest or attempting to evade arrest by flight, (4) the duration of the action, (5) the possibility that the suspect may be armed, and (6) the number of persons with whom the police officers must contend at one time ("the *Graham* and *Sharrar* factors"). *See Graham*, 490 U.S. at 396; and *Sharrar v. Felsing*,

24

128 F.3d 810, 822 (3d Cir. 1997). *See also Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).

It is undisputed that Perez resisted arrest by attempting to leave the scene after Cuneo advised him that he was taking him into custody. Perez' resistance triggered Cuneo's right and authority to use force to effectuate the arrest. But, as detailed below, disputed issues of fact remain regarding the reasonableness of the force Cuneo chose to use against Perez.

### a. Cuneo's initial use of his taser.

The disputed issues of fact in this case include whether Cuneo gave any verbal warnings to Perez before Cuneo first used his taser on him. Perez says that after he questioned Cuneo's authority to arrest him on the DNA search warrant and refused to go with Cuneo, he proceeded to "jog" across the street. He further asserts that Cuneo then fired his taser at him without warning. ECF 57-2, p. 20. In contrast, Cuneo contends that he specifically told Perez that he would "tase" him if he did not stop and fired his taser only after Perez failed to comply. This dispute is material. *See Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (noting that an officer's use of force was unreasonable when he did not provide a warning before deploying the taser). As one district court within this Circuit observed, "[w]hether warnings were given prior to tasing is important to showing whether this use of force was appropriate." *Geist v. Ammary*, 40 F. Supp. 3d 467, 480–81 (E.D. Pa. 2014) (citing

*Brown v. Cwynar*, 484 Fed. Appx. 676 (3d Cir. 2012) (use of a taser on plaintiff during arrest not excessive force after officer was called to store to deal with a "disruptive customer" and plaintiff/customer was non-complaint after several requests by officer to stop); *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306, 313, 324 (W.D. Pa. 2011) (finding that arresting officer's tasering of a handicapped individual was appropriate after the plaintiff was warned that he might be tasered and the plaintiff responded, "Go ahead and taser me.") (footnote omitted)).

Certain of the *Graham* and *Sharrar* factors also weigh against this Court finding Cuneo's initial use of his taser reasonable as a matter of law. When Cuneo initially approached Perez, he had observed nothing to support a belief that Perez was then involved in any serious crime. The only conduct Cuneo observed was Perez walking down the street. While Perez was a suspect in a burglary investigation, apparently no finding of "probable cause" for his arrest had been made as no warrant for his arrest had been issued. The current record also does not support that Cuneo had reason to believe that Perez represented an immediate threat to his safety or the safety of others when he declined to accompany Cuneo and attempted to leave the scene. Similarly, Defendants have not offered any evidence to support that Cuneo had reason to believe that Perez was armed. On the other hand, Cuneo's action did take place in context of effecting an arrest, and Perez did actively resist arrest and attempt to evade arrest by flight. Given these competing and conflicting considerations, the

reasonableness of Cuneo's initial use of his taser is an issue that must remain for the jury.

          b.  Cuneo's subsequent uses of his taser

Cuneo's subsequent uses of his taser presents a closer call. The video evidence clearly shows that after Perez fell to the ground, his hands were initially concealed beneath his chest despite Cuneo's repeated instructions to place them behind his back. Although Cuneo may have had no reason to believe Perez was armed, he did not know with any certainty he was not, and demanding that a resisting arrestee's hands be made visible is a facially reasonable measure to protect the safety of the officer. Perez contends that his injuries and the initial shock of the taser prevented him from complying, but Cuneo would not necessarily have known this to be the case. Because a given use of force must be evaluated from the perspective of the officer, Cuneo's repeated use of his taser may be viewed as reasonable under these circumstances. On the other hand, Perez asserts that Cuneo should have recognized that he was attempting to comply and surrender when Cuneo repeatedly shocked him with his taser. He also emphasizes the prolonged duration of the shocks administered by Cuneo which literally exhausted the battery of his taser.

Given the conflicts in the testimony of Cuneo and Perez and the inconclusive nature of the video evidence, the Court also finds that the reasonableness of Cuneo's subsequent uses of his taser also constitutes a matter for the jury.

c.  Cuneo's use of his retractable baton

This same analysis and conclusion apply to Cuneo's use of his retractable baton.  By the time Cuneo used his baton, his interaction with Cuneo was completely out of view of his taser camera.  Thus, there is no video evidence regarding what precipitated Cuneo's use of his baton or how he used it.  Cuneo asserts that he used his baton in an attempt to fend off Perez' attacks against him and gain control of him. In contrast, Perez asserts that he did not attack or strike Cuneo and that it was Cuneo who repeatedly struck him in the head with his baton without justification.  Once again, the Court is unable to resolve these factual disputes on summary judgment.

d.  Cuneo's discharge of his firearm

The facts and circumstances surrounding Cuneo's use of his gun to shoot Perez are even more shapely in dispute.  Cuneo asserts that he resorted to deadly force only after Cuneo assaulted him to the point that he feared he might lose consciousness or Perez might gain complete control over him and possibly even obtain his gun.  In contrast, Perez asserts that he was fleeing Cuneo's unwarranted assault upon him and was approximately 12-20 feet away when Cuneo shot him in the back.  The third-party witness, Thomas Costanzo, places Perez approximately 10-15 feet away from Cuneo when Cuneo shot him.  These material discrepancies plainly preclude this Court from finding as a matter of law that Cuneo's use of his gun to shoot Perez was reasonable.

D.     Cuneo is Entitled to Qualified Immunity Only as to His Use of His
       Taser and Baton.

Qualified immunity is "an entitlement not to stand trial or face the burdens of

litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472

U.S. 511, 526 (1985)).  Under this doctrine, a government official is immune from

claims for damages unless the record, viewed in the light most favorable to plaintiff,

shows (1) that the official violated the plaintiff's constitutional rights, and (2) that the

constitutional right that was violated was clearly established.  *Id.* at 201; *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary

functions ... are shielded from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable

person should have known.").  A right is considered clearly established if it is

"sufficiently clear that every reasonable official would have understood that what he is

doing violates that right." *Reichle v. Howards*, 566 U.S. 658 (2012) (alterations omitted);

*see also Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015).

In the context of a case alleging a police officer's illegal arrest or use of

excessive force, the court must "identify the right at issue and determine if that right

was clearly established at the time of the officer's action." *Estep v. Mackey*, 639 Fed.

Appx. 870, 873 (3d Cir. 2016).  "With respect to the first task, courts 'must define the

right allegedly violated at the appropriate level of specificity.'" *Id.* (quoting *Sharp v.*

*Johnson*, 669 F.3d 144, 159 (3d Cir.2012).  Courts must resist the temptation to define

"clearly established law at a high level of generality." *Id.* (remanding case where district court defined right too generally as right to be free from excessive force) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741-42 (2011)). "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition.'" *Estep*, 639 Fed. Appx. at 873 (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir.2015) (quotation marks and citations omitted)). With these principles in mind, the Court turns to Perez' claims in this case.

      1.   Cuneo Is Not Entitled to Qualified Immunity on Perez' Unlawful Arrest Claim.

As to Perez' illegal arrest claim, the right at issue is Perez' right not to be seized by the police without a warrant authorizing the seizure or the officer's observation of facts supporting probable cause to believe the person has committed a crime or at least reasonable suspicion to believe he or she is engaged in criminal activity. This right is embodied in the text of the Fourth Amendment itself, which was adopted by Congress as part of the Bill of Rights on December 15, 1791. This right has been recognized as applicable to the states since 1961 when the Supreme Court decided *Mapp v. Ohio, supra.* Even if the right is defined more specifically as Perez' right to be free from seizure pursuant to a search warrant executed outside of its specified limitations, that right has been clearly established since 1932 when the Supreme Court decided *Sgro v. United States, supra.* Thus, Cuneo violated Perez' clearly established

rights on November 20, 2017, when he arrested him without probable cause or actual

authority conferred by a warrant.

>    2. Cuneo is Entitled to Summary Judgment Based on Qualified
>       Immunity With Respect to the Use of His Taser.

As to Cuneo's initial and subsequent uses of his taser, Perez has failed to show

that Cuneo violated a clearly established right. A right is clearly established if a

reasonable official would understand that what he is doing violates that right. *al-Kidd*,

563 U.S. at 741-42. The circumstances under which Cuneo used his taser are

sufficiently clear from the video evidence that the Court can determine qualified

immunity on the existing record. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (holding

that "the existence in the record of a videotape capturing the events in question" is

properly credited by the court in assessing whether a genuine issue of material fact

remains in a police excessive force case). The video in this case shows Perez fleeing

after Cuneo placed him under arrest and Cuneo's initial use of his taser to stop him.

The video later shows Perez face down on the ground with his hands initially

concealed beneath his chest. Cuneo is heard demanding that Perez place his hands

behind his back and warning Perez that he will tase him if he does not comply. The

video then shows Perez failing to comply and Cuneo engaging his taser.

"The 'clearly established' standard … requires that the legal principle clearly

prohibit the officer's conduct in the particular circumstances before him." *D.C. v.*

*Wesby*, __ U.S. __, 138 S. Ct. 577, 590 (2018). Perez has not cited any controlling

authority holding that the use of a taser to intercept and subdue a fleeing arrestee constitutes excessive force, and the Court has identified no such authority. Perez disputes Cuneo's assertion that he warned him before tasing him and, if a jury were to believe Perez, the jury could find that Cuneo's initial use of the taser was unreasonable. But this does not defeat qualified immunity because no controlling authority established the illegality of using a taser without warning as of November 20, 2017. *See Saucier*, 533 U.S. at 204 ("The inquiries for qualified immunity and excessive force remain distinct."). It has been said that qualified immunity provides police officers "ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 545-46 (2012) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). *See also Bello*, 2013 WL 53981, at *6. That protection extends to Cuneo's initial use of his taser. It also extends to his subsequent uses of his taser. As of November 20, 2017, no controlling authority established that repeated or extended discharge of a taser to compel compliance with police instructions violated the Fourth Amendment's proscription against excessive force. The Court has identified no Supreme Court precedent to support such a proposition, and the Court of Appeals for the Third Circuit has expressly declined to speak in a precedential opinion about taser use. *Estep*, 639 Fed. Appx. 870, 874 n.4. *Cf Brown*, 484 Fed. Appx. 676 (3d Cir. 2012) (recognizing that "multiple courts of appeals had approved the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders") (citing

*Draper v. Reynolds*, 369 F.2d 1270, 1278 (11th Cir. 2004); (*Hinton v. City of Elwood*, 997

F.2d 774, 781 (10th Cir. 1993) (approving use of a stun gun to overcome a suspect's

resistance to arrest).  Because no controlling authority clearly demonstrated the

illegality of Cuneo's use of his taser under the circumstances presented, he is entitled

to qualified immunity on this aspect of Perez' excessive force claim.

> 3. Cuneo is Entitled to Summary Judgment Based on Qualified
>    Immunity With Respect to His Repeated Striking of Perez With His
>    Baton.

An officer's use of a baton to strike a person resisting arrest has been

recognized as a reasonable means to obtain his or her compliance.  *See e.g., Santini v.*

*Fuentes,* 739 Fed. Appx. 718, 721 (3d Cir. 2018) (affirming summary judgment based

on qualified immunity in a 2009 arrest of a non-suspect witness who was pepper-

sprayed and struck with nightsticks prior to being handcuffed when he appeared to be

resisting).  The Court recognizes that Cuneo and Perez' versions of the facts

surrounding Cuneo's use of his baton differ in certain respects and that a

determination of the reasonableness of that force may turn on resolution of these

differences.  But it is undisputed that Perez was either engaged in a physical struggle

with Cuneo or was actively evading arrest.  Again, Perez has not cited, and the Court

has not identified, any controlling authority to support that Cuneo's use of his baton

to repeatedly strike Perez under either circumstance was unconstitutional as of

November 20, 2017.  Accordingly, while issues of fact remain concerning the

reasonableness of Cuneo's use of his baton, they are not material for purposes of the

qualified immunity analysis.  Cuneo is entitled to qualified immunity with respect to this aspect of his excessive force claim.

    4.  Genuine Issues of Material Fact Remain as to Whether Cuneo's Use of His Gun Violated Clearly Established Law.

Supreme Court case law applicable to an assessment of the reasonableness of Cuneo's shooting of Perez was clearly established long before November 20, 2017: "[I]t is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him … [b]ut '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'" *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (internal citation omitted) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989)).  The problem the Court faces in this case is it cannot determine which of these two clearly established propositions of law applies because the facts are sharply in dispute. According to Perez, he was an unarmed, nondangerous individual fleeing from an unlawful arrest when Cuneo shot him in the back.  In contrast, Cuneo asserts that Perez was not just resisting arrest but aggressively attacking him with such ferocity that he feared for his life, prompting him to resort to deadly force.  These disputes of fact are genuine and clearly material.  Accordingly, Cuneo's request for summary judgment based on qualified immunity must be denied as to his shooting of Perez.

E.     The Borough of Johnsonburg is Entitled to Summary Judgment on
       Perez' *Monell* Claim.

Although not identified as a specific count, the allegations of Perez' Amended

Complaint raise a municipal liability claim against the Borough of Johnsonburg

(Borough).  *See* ECF No. 9, ¶¶ 63-67.  A municipal entity such as the Borough cannot

be held liable for its employee's alleged constitutional violations based on a theory of

respondeat superior.  *Monell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658, 691-95

(1978); *Panas v. City of Phila.*, 871 F. Supp. 2d 370, 377-78 (E.D. Pa. May 14, 2012).

Rather, the "government itself, through its policies or practices, must be sufficiently

culpable before" it can be held liable under § 1983.  *Panas*, 871 F. Supp. 2d at 377-78.

Such culpability exists only "when the alleged constitutional transgression implements

or executes a policy, regulation, or decision officially adopted by the governing body

or informally adopted by custom."  *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir.

2009) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).  Merely

alleging the existence of a policy, practice, or custom is not enough.  *Rizzo v. Goode*,

423 U.S. 362, 371 (1976).  A plaintiff in a § 1983 action must show an "affirmative

link" between the occurrence of alleged misconduct and the municipality's policy,

custom, or practice.  *Id.*  Accordingly, "[o]nce a plaintiff has identified a policy or

custom, [he or] she 'must show that the municipal action was taken with the requisite

degree of culpability, and must demonstrate a direct causal link between the municipal

action and the deprivation of federal rights.'"  *Abran v. City of Phila.*, 2020 WL 6781938,

at \*12 (E.D. Pa. Nov. 17, 2020) (quoting *Vulcan Pioneers of New Jersey v. City of Newark*, 374 Fed. Appx. 313, 317 (3d Cir. 2010)).  If the policy does not facially violate federal law, "causation can be established only by 'demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Id.* (quoting *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)).  Thus, in order to impose liability on a local governmental entity for failing to act to preserve constitutional rights, a § 1983 plaintiff must establish not only that he or she was deprived of a constitutional right, but that: (1) the municipality had a policy; (2) the policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (3) the policy was the "moving force behind the constitutional violation." *Weber v. Erie Cty.*, 2020 WL 5983275, at \*5 (W.D. Pa. Oct. 8, 2020) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-91 (1989)).

Perez contends that the Borough failed to "implement training policies and procedures to keep officers from using excessive force" and that it "knew its officers would frequently fail to follow the already inadequate procedures prior to the use of force against" Perez.  ECF No. 9, ¶ 64.  The Supreme Court has also recognized that a local government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  "If the alleged policy or custom at issue is a failure to train or supervise (as it is here), the plaintiff must show that this failure 'amounts to 'deliberate indifference' to the rights of persons with whom [the municipality's] employees will come into contact."

*Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)).  "[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Board of County Com'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997)).

Typically, a plaintiff meets this burden by identifying, "a pattern of similar constitutional violations by untrained employees" that "puts municipal decisionmakers on notice that a new program is necessary...." *Johnson*, 975 F.3d at 403 (quoting *Thomas*, 749 F.3d at 223).  "Otherwise, the plaintiff needs to show that failure to provide the identified training would 'likely ... result in the violation of constitutional rights'—*i.e.*, to show that 'the need for more or different training [was] so obvious." *Id.* (quoting *City of Canton*, 489 U.S. at 390).  The Third Circuit applies a three-part test to determine whether "a municipality's failure to train or supervise amount[s] to deliberate indifference." *Carter.*, 181 F.3d at 357.  A plaintiff must plead: (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.*; *see also Thomas v. Cumberland Cty.*, 749 F.3d 217 at 224–25 (3d Cir. 2014) (quoting *Board of County Com'rs of Bryan Cty.*, 520 U.S. at 409). ("Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and

the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights").

In the present case, Perez has not identified facts to support any of the elements of municipal liability under *Monell* and its progeny. He has not alleged facts to show a history or pattern of police misconduct comparable to that alleged against Cuneo. Nor has he identified a policymaker who was allegedly on notice of such a history or pattern and displayed deliberate indifference to it. The record does not support a finding that the Borough maintained a policy or custom of deliberate indifference to police misconduct or a deliberately indifferent failure to train officers in the face of a clear need to do so. Thus, Perez has failed to establish a genuine dispute of material fact concerning his *Monell* claim and, therefore, the Borough is entitled to judgment as a matter of law.

VI.    Conclusion

Based on the record and applicable law, Defendants' motion for summary judgment must be denied as to Perez' Fourth Amendment illegal seizure/arrest claim. Disputed issues of fact also remain as to the reasonableness of Cuneo's use of his taser and baton during his encounter with Perez, but Cuneo is nevertheless entitled to summary judgment on these aspects of Perez' excessive force claim based on qualified immunity. As to Cuneo's use of his firearm to shoot Perez in the back, genuine issues of material fact preclude summary judgment for Cuneo on the issue of reasonableness

as well as qualified immunity.  Finally, no genuine issue of material fact remains

concerning Perez' municipal liability claim against the Borough of Johnsonburg, and

that Defendant is entitled to judgment as a matter of law.  An appropriate Order will

follow.

BY THE COURT:

HON. RICHARD A. LANZILLO
Dated:  July 23, 2021                    United States Magistrate Judge